**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)
Sean Mack
Darcy Baboulis-Gyscek
Pashman Stein Walder Hayden, P.C.
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201)488-8200
smack@pashmanstein.com
dbaboulis-gyscek@pashmanstein.com

*Attorneys for Petitioning Creditors*

In re:

WHAIRHOUSE REAL ESTATE INVESTMENTS,
LLC,[1]

                              Debtor.

Case No. 23-16723 (RG)

Chapter 11

(Jointly Administered)

**PETITIONING CREDITORS' BRIEF IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT**

The original Petitioning Creditors Alexis Morrillo, Frank Robinson, Michael Ventura, RG3
LLC, Samme Shieka, Jonathan Gunn, Nicholas Tiah, and Faleena and Jermaine Andujar, along
with three new petitioning creditors, Carlos Solano, Fidel Alvarez and Sharihan Nassser,
(collectively, "Petitioners") submit this memorandum of law in support of their motion for
summary judgment for the entry of an order of relief.

---

[1] The Debtors in these Chapter 11 cases, along with their case numbers are as follows: Whairhouse Real Estate Investments, LLC (Case No. 23-16723 (RG)), Taylor Court Apartments LLC (Case No. 23-16641 (RG)), and Whairhouse Limited Liability Company (Case No. 23-17272 (RG)).

## PRELIMINARY STATEMENT

Through this motion the Petitioners seek a ruling that they are entitled to the entry of an order of relief in this involuntary bankruptcy proceeding against the alleged debtor Whairhouse Limited Liability Company ("Whairhouse"). In addition to the eight original creditors who sought such relief, rather than file new lawsuits against Whairhouse based on the same types of claims as Petitioners, three additional creditors have filed an amended involuntary petition (D.I.#50), and nine other victims join in and are filing herewith declarations in support of the request for entry of an order of relief.  There also are 17 pending lawsuits, involving 20 creditors, in state court against Whairhouse alleging similar claims. (Mack Cert., Ex A).   With Whairhouse clearly not paying its debts when they come due, and the proverbial race to the courthouse to dismember Whairhouse and its assets well underway, this is a prime example of a debtor that should be placed into involuntary bankruptcy so that the powers of this Court can ensure a fair and orderly administration of its assets for the benefit of all creditors.

Tellingly, in response to the involuntary petition for bankruptcy and a motion to appoint a trustee, the alleged debtor, Whairhouse, did not contest any of the material facts set forth by the Petitioners.  Whairhouse did not dispute that it has been operating a real estate based Ponzi-like scheme, it did not dispute that each of the Petitioners invested with it the money set forth in the joint venture agreements attached to each of their declarations, and it did not dispute that it failed to pay each of the Petitioners the returns that the joint venture agreements prepared by Whairhouse stated would be paid.

Instead, Whairhouse's sole opposition is based on the flawed argument that the Petitioners are not qualified creditors because Whairhouse claims there is a bona fide dispute regarding

whether New Jersey's usury laws preclude each of the Petitioners from recovering the "interest" that Whairhouse promised to them under their joint venture agreements. Notably, Whairhouse has not disputed that the Petitioners are owed the millions of dollars of principal invested by them. Whairhouse's argument is hopelessly flawed for several reasons: (1) usury laws should not apply in this case; (2) Whairhouse, as a company, is expressly precluded by New Jersey statute from asserting usury as a defense in a civil lawsuit; (3) the interest sought does not exceed the criminal usury statute limitations; and (4) the joint venture agreements on which each Petitioner bases his or her claim are "investment contracts" that are not subject to New Jersey's usury laws.

More fundamentally, Whairhouse's usury defense is a red herring. Whairhouse perpetrated a massive Ponzi-like scheme and each of the Petitioners, as well as the joining creditors and state court plaintiffs, is a victim of the fraud perpetrated by Whairhouse. Whairhouse has not, and cannot, dispute this fraud and each of the Petitioners is clearly owed at least the amount of their investments.

In addition, to the extent the Court is concerned that Whairhouse may have raised a question as to the "amount" owed to the Petitioning Creditors, three new petitioning creditors filed an amended petition claiming only the principal amount they invested. Each of the properties they invested in were sold, but they were not repaid. Thus, regardless of the arguments previously raised by Whairhouse, it cannot dispute liability or amount owed to the three new petitioning creditors who are indisputably owed $400,000.

As there are more than enough qualified petitioning creditors whose undisputed claims far exceed the statutory minimum, Whairhouse's arguments should be rejected, and an order for relief should be entered.

## **FACTUAL BACKGROUND**

Whairhouse was used by Cesar Pina to operate a real estate Ponzi-like scheme, instead of for the purposes represented to each of the Petitioners in their joint venture agreements. (Petitioners'' Statement of Undisputed Material Facts ("SUMF") ¶4-34)

Cesar Pina claimed to operate a successful property flipping empire known as "Flipping NJ," which gained widespread recognition and perceived legitimacy when it was promoted by Cesar's partner, Raashaun Casey a/k/a DJ Envy on his radio program, Power 105.1 "The Breakfast Club" and his social media with upwards of 2 million followers, as well as Cesar's social media page. Cesar Pina and DJ Envy also promoted their allegedly successful real estate deals through paid seminars.  With the fame achieved by Cesar Pina based on DJ Envy's promotion of his real estate deals, Cesar was able to induce many people, including the Petitioners, to invest in real estate projects purportedly owned by the Debtor.[2] (Victims Declarations ¶1-2)

Whairhouse has admitted[3] that it entered into no less than 57 joint venture agreements with numerous victims.  (Mack Cert., ¶3-4 and Ex. B) Nearly each investment followed the same pattern

---

[2] Each of the Petitioners submitted a declaration in support of their motion to appoint an interim trustee over Whairhouse (D.I.# 2.3 through 2.10), which was granted by this Court (D.I.#20). Rather than refile those Declarations, Petitioners refer to them herein as "Petitioners' Declarations."  In addition, twelve additional victims join in this request to enter an order for relief and are submitting declarations in support in connection with this motion.  The Declarations of Ana Vallejo, Bianca Polanco, Melixsa Rodriguez, Sharihan Nasser, Taysir Sheika, Richard Fernandez, Fidel Alvarez, Andrew Semidey, Jose Santiago, Luis Savaria, Ricky Rodriguez, and Carlos Solano are collectively referred to as the "Supporting Declarations."  The Petitioners' Declarations and Supporting Declarations are collectively referred to as the "Victims Declarations."

[3] By law, as a result of Whairhouse's failure to respond timely to the Petitioners' Requests for Admission, each request is deemed an admission.  (Fed. R. Civ. Pro. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection….")

with similarly structured joint venture agreements.  The investor would meet Cesar at one of Cesar and DJ Envy's seminars, or separately pay for an independent consultation with Cesar, and then Cesar would pitch a particular "joint venture" to the investor based on the amount of money the investor had available to invest. (E.g., Santiago Declaration, ¶4)

Cesar would then provide the investor with a two page "joint venture" agreement between the Debtor and the investor. (Exhibit A to each of the Victims Declarations) Aside from the name of the investor, the date, the amount invested, and the property address, most of the joint venture agreements were identical. (Id.) In that regard, each of the joint venture agreements prepared by Whairhouse for each of its victims is titled "joint venture agreement."  (Exhibit A to each Petitioners' Declaration (D.I. #2.3 through 2.10) and of the Supporting Declarations).   Each joint venture agreement then sets forth in Section II the "Purpose" of the joint venture, which "shall be for the purchase, remodel and eventual sale of the Property."  The specific "Property" to be flipped under each joint venture agreement also is identified in Section II.

Each joint venture agreement then also makes clear that the only thing required of the investor is his or her investment, and Whairhouse will do everything else required to turn a profit. Each agreement recites a similar sentence that "Whairhouse LLC shall be solely responsible to purchase, remodel and sale of the Property."  Most agreements also specified that "Whairhouse LLC shall be responsible to pay for any and all remodeling of the Property."

Each agreement recited in a Section V entitled "Capital Contributions / Distribution" what was the "initial capital" contributed by each investor for the joint venture.

Section V(c) of each agreement then provides "**Profits after the Sale of the Property**. Once the Property is sold Investor will be entitled to a return of their initial $[xxxxxxx] capital

contribution.  In addition, Investor shall be entitled to an interest payment of $[yyyyyy]." This guaranteed return was to be paid within a set number of months, usually three to five months.

Although the word "interest" is used in Section V(c), it is clearly describing the "profits after sale of the property" that will be earned on the investors "capital contribution."  As set forth below, courts routinely look beyond the words through which an agreement is clothed and consider the overall structure of the agreement to determine what is its true nature.

The structure here is clearly that of a person investing money and relying entirely on the efforts of the other party (here, a self-professed house flipping guru) to generate a profit for the investor.  As explained below, that structure is a quintessential "investment contract" and not a loan.

Notably, to date, Whairhouse has not disputed that any of the Petitioners made the "capital contribution" called for by their joint venture agreements.  Whairhouse also did not dispute that it promised to purchase, renovate and flip each of the properties identified in each of the joint venture agreements, but failed to do so.  Whairhouse also does not dispute that it prepared the joint venture agreements and proposed the profits to be earned under each joint venture agreement.  Whairhouse further admits that each Petitioner is owed their "capital contribution" under each joint venture agreement, only disputing the obligation to repay the "profit" for public policy reasons. (D.I.#14.1)

The Petitioners and the supporting victims each provided money to Whairhouse pursuant to one or more joint venture agreements and still have not been repaid their principal and promised guaranteed return. (Victim Declarations) In many cases, the Petitioners and supporting victims have discovered that they invested in the same property that Cesar offered to other victims.  (SUMF ¶14, 15, 17, 18, 22, 23, 25, 26, 27, 28, 33)

Because of this, Whairhouse has now been named as a defendant in at least 17 lawsuits accusing Whairhouse and Cesar Pina of operating a fraudulent real estate scam. (Mack Cert., Ex. A) Whairhouse is clearly not paying its debts as they come due in the ordinary course of business. The proverbial race to the courthouse for Whairhouse's assets is now underway.

Unfortunately for these investors, while they were relying on Whairhouse and the Pinas to perform their obligations under the joint venture agreements, Whairhouse took their money and did not use it to purchase or renovate the property, and instead had already sold the property before the Petitioners invested, purchased the property through a different entity, sold the property and never delivered the profits from the sale, or tricked more investors to provide capital investments to purchase and flip the same property already under joint venture with the Petitioners. (SUMF ¶13-34)  In short, Whairhouse and the Pinas were operating a Ponzi-like real estate investment scheme.

Each of the Petitioners entered into at least one joint venture agreement with Whairhouse. The following is a list of each Petitioner, the amount invested, and the property that was supposed to be purchased and renovated by Whairhouse within a few months:

| Property Address | Investor | Amount Invested |
| --- | --- | --- |
| 145-147 Manchester Ave, Paterson, NJ | Alexis Morillo | $100,000.00 |
| 149 Franklin Ave, Hawthorne, NJ | Frank Robinson | $270,000.00 |
| 555-563 Main Street, Paterson, NJ | Frank Robinson | $351,000.00 |
| 14 Commerce St., Garfield, NJ | Frank Robinson | $155,900.00 |
| 523 Park Ave, Paterson, NJ | Frank Robinson | $25,000.00 |

| 147-149 Manchester Ave, Paterson, NJ | Jonathan Gunn | $100,000 |
|---|---|---|
| 141 E 32nd St, Paterson, NJ | Michael Ventura | $200,000.00 |
| 126 Jasper St, Paterson, NJ | Michael Ventura | roll over of prior investment |
| Unstated | Michael Ventura | roll over of prior investment |
| 93 Highland St, Paterson, NJ | Nicholaus Tiah | $116,875 |
| 27 South Boyden Parkway, Maplewood, NJ | Ramon Garcia / RG3 LLC | $350,000.00 |
| 462-464 East 24th Street and 568-570 East 39th Street, Paterson, NJ | Ramon Garcia / RG3 LLC | $300,000.00 |
| 462-464 East 24th Street and 523 Park Ave, Paterson, NJ | Ramon Garcia / RG3 LLC | $1,000,000.00 |
| 7033 S Morgan Ct. Chicago, IL | Ramon Garcia / RG3 LLC | $250,000.00 |
| 145 Union Avenue, Paterson, NJ | Samme Sheika | $100,000 |
| 523 Park Ave, Paterson, NJ | Samme Sheika | $100,000.00 |

[Exhibit A to each of the Petitioners Declarations]

In each case, the Petitioners were promised to have been repaid their investment along with a guaranteed return long ago. (Petitioners Declarations)

We highlight the three new petitioning creditors (D.I.#50) to demonstrate that there can be no dispute as to whether there are three unsecured creditors who are owed more than $18,600 in the aggregate.  Petitioner Alvarez invested $100,000 to flip 149-151 Manchester Avenue, Paterson and was promised the return of his principal plus interest when that property was sold. (Alvarez

Dec.)  That property was sold on June 17, 2023. (SUMF, ₱24) Petitioner Nasser invested $200,000 and Petitioner Solano invested $100,000 to flip 220 Kearney Avenue, Paterson and were each promised the return of their principal plus interest when that property was sold. (Nasser Dec., Solano Dec.)  That property was sold on June 21, 2022.  (SUMF, ₱27)

Each of Alvarez, Nasser, and Solano has joined the involuntary petition, claiming only the amount of principal owed to them.  (D.I.#50)   As set forth in their Declarations, none of them have been repaid what they are owed. (Alvarez Dec., Nasser Dec., Solano Dec.)

As a result of the foregoing and other wrongful actions, a criminal complaint was filed against Cesar Pina by the United States of America stating that "Pina began accepting investments from individual investors (the 'Victims') for the alleged purchase, remodel, and sale of specific real estate projects in New Jersey and other states….But rather than using the Victims' investments as promised, Pina engaged in a Ponzi-like scheme wherein he commingled Victim investors' money and used new Victims' investments to pay off prior investors and cover personal expenditures." (Mack Cert., Ex. C) Cesar Pina was arrested on October 18, 2023.

On October 18, 2023, an Order Setting Conditions of release on bond was entered.  Among the conditions of Pina's release is that he "have no contact … with co-conspirators, victims and witnesses, unless in the presence of counsel."  (Mack Cert., Ex. D at p.2) The order also provides that Cesar Pina "shall not engage in any real estate transactions directly or indirectly or be involved in any real estate transactions through other people." (Id.)

**<u>LEGAL ARGUMENT</u>**

**I.      Petitioners Satisfy the Requirements for an Order for Relief on the Pending Involuntary Petition.**

An order for relief should be entered because this case was properly commenced by more than three unsecured creditors whose undisputed claims aggregate at least $18,600. *See* 11 U.S.C. § 303(b)(1). Indeed, this case was commenced by eight unsecured creditors who are indisputably owed millions of dollars and was joined by three additional creditors[4] owed $400,000 whose claims Whairhouse cannot dispute as to liability or amount, and is further supported by nine other creditors owed millions of dollars.

It also is indisputable that Whairhouse is not generally paying its debts as they came due in the ordinary course of business.  In addition to the eight Petitioners, twelve other victims of Whairhouse's fraud are joining in this request to enter an order for relief (Supporting Declarations) and there are currently 17 lawsuits pending against Whairhouse brought by other fraud victims and various lenders to its business, all alleging that Whairhouse has not timely paid its debts. (Mack Cert., Ex. A).

Moreover, Cesar Pina, who has been the managing force behind Whairhouse and orchestrated its fraud was arrested on October 18, 2023, with one of the conditions of his release on bail being that he is prohibited from contacting any of the victims or engaging in any real estate transactions.  (Mack Cert., Ex. D) As a result, but for this Court's appointment of a trustee

---

[4] It is well settled that 11 U.S.C. § 303(c) affords other creditors the right to join an involuntary petition before the case is dismissed or an order for relief is entered as a "matter of right."  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 337 (3d Cir. 2015).

(D.I# 20), there would be no one to manage Whairhouse's business or to communicate with its creditors about repaying them.

Here, it is undisputed that the Petitioners are the victims of a wide-ranging Ponzi-like scheme that has been perpetrated by the Pinas using multiple companies, including Whairhouse, and victimizing scores of people. Rather than file eight more individual lawsuits in state court against Whairhouse and join in the ongoing race for Whairhouse's assets, Petitioners filed this involuntary petition – in the same court that the Pinas had already voluntarily filed Taylor Court Apartments LLC for bankruptcy (Dkt. No. 23-16641) – to consolidate all creditors' claims so that all creditors could share fairly in a recovery. Ponzi type cases like this regularly are resolved through the bankruptcy courts precisely because this Court is much better suited than state courts to unravel Ponzi-schemes, the inevitable fraudulent transfer of assets involved in Ponzi-schemes and overseeing equitable distribution of assets to all creditors. *See, e.g., In re Engler*, 500 B.R. 163, 165 (Bankr. M.D. Fla. 2013) (involving an involuntary petition filed to "put an end to" the Ponzi scheme being operated by the debtor); *Barnard v. Albert (In re Janitorial Close-Out City Corp.)*, Nos. 09-7982-AST, 11-8952-AST, 2013 Bankr. LEXIS 523, at *2 (Bankr. E.D.N.Y. Feb. 8, 2013) (same); *In re Applegate*, No. 05-67759, 2007 Bankr. LEXIS 4184, at *2 (Bankr. N.D. Ohio Dec. 12, 2007) (same); *accord In re Apache Trading Group, Inc.*, 229 Bankr. 891,894 (Bankr. S.D. Fla. 1999) ("Legitimate reasons for filing an involuntary bankruptcy petition include the invocation of the protection of the Bankruptcy Court to protect the petitioning creditors and the other creditors, and the investigation, accounting for, and protection of the debtor's assets").

Therefore, the Court should enter an order for relief against Whairhouse.  11 U.S.C. § 303(h)(1) ("court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount").

## II.      There is No Bona Fide Dispute Regarding the Petitioners' Claims.

Whairhouse has not raised any *bona fide* dispute regarding Petitioners' claims because it has failed to assert a substantial factual or legal question as to Whairhouse's liability to Petitioners.  *B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989).

Whairhouse has admitted that the joint venture agreements attached to the Victims Declarations are valid contracts entered into between the Petitioners and Whairhouse. (Mack Cert., Ex. B)  Whairhouse has not disputed the sworn declarations of the Petitioners and cannot dispute that it has not paid them what they are owed under their joint venture agreements (Petitioner Declarations) and has admitted that the Petitioners are owed at least the amount of principal they invested with Whairhouse, which totals in the millions of dollars.  [D.I.# 14.1] Whairhouse also cannot dispute that it engaged in fraud by inducing the Petitioners and other victims to invest in properties: (i) that it never owned and never acquired, (ii) that it had already obtained other investors for, (iii) that were owned by another affiliated company, or (iv) that it had already sold.  (SUMF ¶13-34).

To state a claim under the New Jersey Consumer Fraud Act, a plaintiff must allege "(1) unlawful conduct; (2) ascertainable loss; and (3) a causal relationship between the unlawful

conduct and the ascertainable loss." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 389 (2007).  The Act broadly defines unlawful conduct as "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission." N.J.S.A. 56:8-2. The "prime ingredient" of an unconscionable commercial practice or a deception is the capacity to mislead – not intent. *Fenwick v. Kay Am. Jeep, Inc.*, 72 N.J. 372, 378 (1977).

Clearly, Whairhouse's conduct here satisfies New Jersey's standard for "unlawful conduct;" it is undisputed that each of the Petitioners suffered an ascertainable loss from their investments not being repaid; and there is a clear causal relationship between Whairhouse's unlawful conduct in inducing Petitioners to enter in the joint venture agreements and their significant losses.  Thus, there can be no substantial legal or factual question that Whairhouse engaged in fraud and is thereby liable to Petitioners.

Nevertheless, in opposition to the involuntary petition, Whairhouse has previously argued that Petitioners are not qualified petitioning creditors because the joint venture agreements that Whairhouse drafted and gave to each of them constitute what would allegedly be "usurious interest" that cannot be collected and therefore there is a bona fide dispute as to the amount of their claims.  Whairhouse's argument was and is flawed for a number of reasons.

First and foremost, regardless of whether the joint venture agreements contain usurious terms or how these contracts are characterized, Whairhouse engaged in fraud by operating a Ponzi-like scheme and therefore Petitioners are qualified creditors.  *See, e.g., Bartenwerfer v. Buckley*, 143 S. Ct. 665, 671 (2023) (explaining fraud victim is a creditor who is owed a debt for money

obtained by false pretenses, a false representation, or actual fraud); *In re Engler*, 500 B.R. 163,

165 (Bankr. M.D. Fla. 2013) (three victims of Ponzi scheme filed involuntary petition).

Moreover, three new petitioning creditors have joined this involuntary petition asserting

only claims for their principal investment.  (D.I.# 50)  Whairhouse has admitted it entered into

contracts with them  (Mack Cert., Ex. B Admissions 7, 20),  and it is indisputable that Whairhouse

failed to repay them their principal investment when the three properties they invested in were

sold. (Alvarez Dec., Solano Dec., Nasser Dec.; SUMF ¶24, 27)  Thus, Whairhouse cannot raise

any dispute as to liability or amount with respect to the three new petitioning creditors' claims.

In addition to being qualified tort creditors, Whairhouse's arguments do not raise a

substantial question regarding the viability of Petitioners' status as qualified creditors for breach

of contract.

### A.    Usury Laws Are Inapplicable in this Case.

Fundamentally, "[u]sury laws exist to protect oppressed borrowers" and "are designed 'to

prevent avarice from preying upon necessity." *Ferdon v. Zarriello Bros. Inc.*, 87 N.J. Super. 124,

134 (Law. Div. 1965). They do not, however, exist to shield an actor like Whairhouse, who under

fraudulent pretenses solicited investments from the Petitioners, many of whom invested their life

savings, from contractual obligations on terms which Whairhouse itself determined. The

application of usury principles in this case, as Whairhouse suggests would utterly turn that

important public policy on its head.

Unsurprisingly, this case is distinct from the types of cases where usury is a proper defense.

*See, e.g., Ferdon v. Zarriello Bros. Inc.*, 87 N.J. Super. 124, 136 (Law. Div. 1965) (recognizing that

although guarantors of a loan are typically "not likely to be overcome by financial need" and thus

"not in need of protection" under usury laws, usury was available as a defense to individual borrower who, as an added price for a loan, assumed the obligation of the corporate defendant without receiving independent consideration for that additional undertaking); *Yasner v. Com. Mortg. Co.*, 120 N.J. Super. 522 (Dist. Ct. 1972) (mortgage loan compelling payment of placement fee by vendor of property in addition to interest rate agreed to by individual borrower was in effect no more than a usurious exaction on part of lender to permit it to circumvent prohibition against such a transaction contained in statute); *Hubschman v. Broda*, 103 N.J. Super. 494, 495 (Ch. Div. 1968) (borrower who was "in need of" $100,000 executed loan agreement secured by a bond and mortgage in exchange for $9,000 payment advanced to lender, plus annual interest beyond usury threshold and two $5,000 payments to extend the loan when borrower failed to pay on time); *cf. Herkimer Inv., LLC v. Goldstein*, No. A-5944-10T2, 2012 WL 2923342, at *7 (N.J. App. Div. July 19, 2012) (in declining to find usury in "a commercial transaction entered into by presumably sophisticated parties dealing in an expensive, high-risk, high-reward opportunity" and distinguishing those facts from cases involving "allegations of usurious interest in the purchase of a single-family home").

As a matter of equity, application of the doctrines of *in pari delicto* and unclean hands to these facts is compelling, where the principals of Whairhouse, who by every indication were operating a Ponzi-like scheme – which they notably have yet to deny in any court – callously seek to invoke the doctrine of usury to skirt their obligations on terms that they dictated to the Petitioners.  In other words, Whairhouse accuses the Petitioners of wrongdoing under usury laws only to benefit from its own wrongdoing. *Terlecky v. Hurd (In re Dublin Sec.)*, 133 F.3d 377, 380

(6th Cir. 1997) ("The doctrine is premised upon the equitable principle that "no Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.").

Bankruptcy courts have thus applied *in pari delicto* to prevent operators of Ponzi schemes from relying on usury, which also confirms the unique suitability of the bankruptcy forum to preside over this Ponzi scheme type case. *See e.g.*, *Burkart v. Bisessar (In re Singh)*, 2015 Bankr. LEXIS 1440, at *21 (Bankr. E.D. Cal. Apr. 22, 2015) ("[T]he court has no trouble concluding that the policy underlying the usury law; namely, the protection of the needy and unwary borrower, does not apply to the debtor, and that the policies supporting the *in pari delicto* doctrine do apply to his transactions with investors."); *Seror v. Farias (In re L.D.T Invs., Inc.)*, Nos. 1:11-bk-22664-MT, 1:12-ap-01360-MT, 2017 Bankr. LEXIS 1029, at *23 (Bankr. C.D. Cal. Apr. 13, 2017) (concluding there was a *prima facie* showing that the defense of *in pari delicto* applied in a Ponzi scheme case, and granting summary judgment against trustee on the usury claim accordingly); *see also Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 330 (Bankr. S.D.N.Y. 1996) (recognizing that "in pari delicto . . . generally applies to Ponzi schemes or other illegal transactions").

In a similar vein, courts have estopped a debtor who induces a usurious transaction from later claiming usury as a defense. *See Wesley v. DeFonce Contracting Corp.*, 216 A.2d 811, 814 (Conn.1966) (estopping corporate borrowers from asserting a usury defense to avoid obligations to an elderly individual in a transaction for which such corporate borrowers set the terms of, supplied the note, and persuaded the individual not to consult her attorney, emphasizing that "this was not the ordinary commercial transaction"); *Jue v. Bass,* 299 F.2d 374, 378 (9th Cir. 1962) ("[W]hen a borrower fraudulently inserts a usurious interest rate in order to later defeat recovery

against him, . . . he may be estopped from using the defense of usury."). Absent estoppel in this circumstance, fraudulent actors would be rewarded for inducing contracts in excess of maximum interest that they can later avoid repayment by claiming usury.

Such cases demonstrate a threshold flaw in Whairhouse's attempt to characterize these joint venture agreements as subject to usury laws that are designed to protect oppressed and oftentimes desperate borrowers lacking adequate leverage, unlike Whairhouse and the Court should reject its attempt to use usury to generate a *bona fide* dispute.

### B.    As A Limited Liability Company, the Law Prohibits Whairhouse from Interposing a Usury Defense.

Whairhouse's assertion of usury as a defense to dispute the amount of "interest" owed to the Petitioners also fails because New Jersey law expressly precludes limited liability companies like Whairhouse from asserting usury as a defense to its obligations.  N.J.S.A. §31:1-6 states plainly, "[n]o corporation, limited liability company or limited liability partnership shall plead or set up the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation, limited liability company or limited liability partnership."    The New Jersey Supreme Court has reinforced the impact of the statute as preventing corporate entities from asserting usury. *Gelber v. Kugel's Tavern*, 10 N.J. 191, 195-196 (1952) ("If, however, the loans are actually made to the corporation, direct, usury is not a defense even to endorsers of corporate obligations issued for loans."); *Tabatchnick Realty Group, LLC v. PNC Bank, N.A.*, 2007 U.S. Dist. LEXIS 10468, *9 ("The New Jersey usury statute specifically excludes corporations like [the plaintiff] from its protection.")

Accordingly, Whairhouse, being a company, cannot raise usury in defense of its obligations under the joint venture agreements nor use it in its red herring effort to manufacture a *bona fide* dispute as to the amount owed to the Petitioners.

### C.    The "Interest" Does Not Exceed the Maximum of 50% Permitted by Law.

Alternatively, even if Whairhouse could raise usury as a defense, the "interest" promised in the joint venture agreements does not exceed the maximum of 50% permitted by New Jersey law.  A loan to an entity violates the criminal usury statute only if the interest charged exceeds an annual rate of 50%. N.J.S.A. 2C:21-19(a). The joint venture agreements do not define an interest rate in excess of 50%, they simply guarantee a specified return and state that it will be paid in approximately 4 to 6 months.  Unlike the way "interest" payments normally work, the Petitioners do not receive more or less "interest" depending on how quickly or how slowly they are paid back. Whether they are repaid in two months or eight months, they receive the same amount of "interest." If the "interest" is paid in less than 7 months, then the per annum return would exceed 50%.  But if the "interest" is not paid for 7 months and 6 days, the per annum return would be less than 50%. In other words, by Whairhouse's logic, each month that the "interest" is not paid decreases the per annum interest rate.  In the case of each of the Petitioners, it has been more than 7.2 months since they signed their joint venture agreements and they have not been paid, so the per annum "interest rate" they are each seeking is less than 50%.  The joint venture agreements thus do not exact "interest" beyond the maximum threshold for criminal usury applicable to corporate obligors, were that test to even apply in this case.

**D.      The Joint Venture Agreements Are Not Void.**

Despite what Whairhouse apparently hopes to achieve, neither the civil nor criminal usury statutes "provide for the avoidance of usurious contracts," even if a usurious contract were found to exist here. *Schuran, Inc. v. Walnut Hill Assocs.*, 256 N.J. Super. 228, 231 (Law. Div. 1991). Legally and in essence, "usury" requires an "unlawful or corrupt intent, an intent to do what the law prohibits, namely to take for the loan or forbearance of money something in addition to the [specified] percent per annum that the statute allows." *Altman v. Altman*, 8 N.J. Super. 301 (Ch.1950).  It is not enough to presume "that there was a corrupt bargain" as Whairhouse does. *Id.* at 307; *see also Maltese Holding Corporation v. Crowley*, 8 N.J. Misc. 86 (Ch.1930) ("Corrupt bargain to contravene statute must be established to sustain plea of usury."). The facts are simply devoid of any notion that the Petitioners entered into the joint venture agreements seeking an agreement with knowledge of any illegality.  Rather, the Petitioners entered into the joint venture agreements based on what Cesar Pina, one of Whairhouse's principals, misled them to believe was a safe investment, with backing of celebrity endorsement to give the veil of legitimacy, based upon their claim to be successful real estate flippers. *See, e.g.*, Declaration of Michael Ventura (D.I.#2.5), ¶ 2; Declaration of Roman Garcia (D.I.# 2.6), ¶¶ 1-4; Declaration of Samme Sheika (D.I.# 2.8), ¶¶ 2-3.

**E.      The Joint Venture Agreements Are Not Subject to Usury Laws.**

Alternatively, even if the Court believes that usury laws can be asserted by a limited liability company and should be applied under these facts – which it should not - the joint venture agreements can be viewed as "investment contracts" that are not subject to usury laws.  An "investment contract" is a form of security and is defined as "a contract, transaction or scheme

whereby a person invests his money in a common enterprise and is led to expect profits solely

from the efforts of the promoter or third party." *SEC v W.J. Howey Co.* 328 U.S. 293, 298-99

(1946).[5]  According to the Supreme Court, the "legal terminology in which such contracts are

clothed" is irrelevant; the test is "whether the scheme involves an investment of money in a

common enterprise with profits to come solely from the efforts of others." *Id.* at 300-301. In this

type of business venture, "the investors provide the capital and share in the earnings and profits;

the promoters manage, control and operate the enterprise." *Id.* at 300. Practically, an investment

contract provides the "opportunity to contribute money and to share in the profits of the enterprise

to those persons who lack, for example, the experience or desire to develop the venture themselves

but are "attracted solely by the prospects of a return on their investment." *Id.* at 299-300.

That is what occurred in this case. Whairhouse promoted to the Petitioners and solicited

their investments in a purported real estate development joint venture, to wit: the purchase,

remodel and sale of specific parcels of real property to be performed solely through Whairhouse's

efforts, as stated in the joint venture agreements. Those properties were to be developed solely

through the efforts of the Debtor, with the Petitioners entitled to a share of the profits "***once*** the

property was sold" – the existence of that very contingency (which has now either already occurred

or will never occur because of Whairhouse's fraud as detailed in the Petitioners' Statement of

Undisputed Material Facts confirms that these were not "loans." *See Dopp v. Yari*, 927 F. Supp.

814, 820-21 (D.N.J. 1996) (agreement was not a loan, but a joint undertaking whereby collection

of the entire interest was at risk and dependent upon a "contingent event"). Even in those joint

---

[5] New Jersey courts expressly follow *Howey* in evaluating whether an agreement is an "investment
contract." *See Manheim NJ Investments, Inc. v. Dir., Div. of Taxation*, 30 N.J. Tax 18, 35 (2017);
*Matter of Bruno*, A-0967-19, 2021 WL 1140095, at *6 (App. Div. Mar. 25, 2021).

venture agreements that included a provision attempting to guarantee payment of profits by a date certain through refinancing, there was no guarantee as to how quickly Whairhouse was required to refinance, for example. *See* Declaration of Morrillo (D.I.#2.3), Ex. A at 1. Moreover, the law is clear that just because Whairhouse in drafting the joint venture agreements chose to call those profits "interest" does not make it so. *See Howey*, 328 U.S. at 298-99.

On remarkably similar facts, the Georgia Court of Appeals in *Golden Atlanta Site Development, Inc. v. Nahai*, 229 Ga. App. 646, 647 (2009) held that usury laws do not apply to investment contracts like the joint venture agreements in this case. In that case, the court expressly rejected a developer's argument that its contract with an investor pursuant to which the investor paid $100,000 toward development of certain property in exchange for either $165,000 after one year or title to the property was not a loan subject to usury laws. Rather, the agreement was an investment contract for a business venture pursuant to which the investor contributed capital in a common enterprise for the development of commercial real estate and was promised a return on that investment solely as a result of the developer's efforts in developing the property.[6] *Id.* at 648. The Court affirmed summary judgment to the investor on her breach of contract claim accordingly. *Id.*; *accord. Cure v. Sussman*, 795 S.W.2d 804, 805 (Tex. App. 1990) (in a securities fraud action, rejecting usury defense asserted on an investment contract meeting the *Howey* standard that guaranteed 50% return on investments).

Thus, the usury laws are inapplicable to the investment contracts at issue, and there is no *bona fide* dispute as to the amount owed to each of the Petitioners.

---

[6] Like New Jersey, courts in Georgia also apply *Howey*'s definition of an investment contract. *See Golden Atlanta*, 229 Ga. App. at 648 (citing *Ga. Market Centers v. Fortson*, 225 Ga. 854 (1969)).

For the multitude of legal and equitable reasons set forth above, there is no "meritorious contention as to the application of law to undisputed facts" and therefore no *bona fide* dispute raised in this Petition under Section 303(b). *B.D.W. Associates, Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66 (3d Cir. 1989); *In re AMC Investors, LLC*, 406 B.R. 478, 483-84 (Bankr. D. Del. 2009) (quoting *Busick*, 831 F.2d at 750).

III.    **THE PETITION COMPLIES WITH SECTION 303(b) EVEN IF THERE IS A DISPUTE AS TO WHETHER PETITIONERS ARE ENTITLED TO THE "INTEREST."**

Even if the Court somehow concludes the joint venture agreements are usurious, and the Petitioning Creditors are not entitled to full repayment, which the Court should not for the many reasons set forth above, the Petitioners remain bona fide creditors properly before this Court under Section 303(b).

Whairhouse asserts that the Petitioners are disqualified solely because a portion of their claims (the "interest") are allegedly subject to a *bona fide* dispute.  However, the Court should reject this argument. Following the 2005 amendments to the Bankruptcy Code resulting from the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), a holder of a claim is qualified to be a petitioning creditor in an involuntary bankruptcy case where that creditor's claim "is not contingent as to liability or the subject of a *bona fide* dispute *as to liability or amount*." 11 U.S.C. § 303(b) (emphasis added).  Immediately following the adoption of BAPCPA, the courts were split regarding whether the addition of the phrase "as to liability or amount" automatically disqualifies a petitioning creditor whose claim is only partially in dispute. *See, e.g., In re DemirCo Holdings Inc*., 2006 Bankr. LEXIS 1131 (Bankr. C.D. Ill. June 9, 2006) (*bona fide* dispute regarding portion of creditor's claim does not disqualify creditor: *bona*

*fide* dispute is relevant only if it has potential to reduce total amount of petitioning claims below statutory threshold); *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 626–27 (Bankr. N.D. Okla. 2005) (because $28,000 of petitioning creditor's $83,000 claim was objectively undisputable, creditor held undisputed claim in excess of the statutory minimum and was therefore qualified petitioning creditor); *but see Regional Anesthesia Assocs. PC v. PHN Physician Servs.* (*In re Regional Anesthesia Assocs. PC*), 360 B.R. 466, 470 (Bankr. W.D. Pa. 2007) (under the 2005 amendments, any dispute regarding amount when dispute arises from same transaction and is directly related to underlying claim makes claim subject to *bona fide* dispute); *In re Euro-American Lodging Corp.*, 357 B.R. 700 (Bankr. S.D.N.Y. 2007) (as result of amendment, any dispute regarding amount that arises from same transaction and is directly related to underlying claim should render claim subject to bona fide dispute) (*dictum*).

As noted in Colliers, the "better view" – and what the more recent court decisions have uniformly held – is that the BAPCPA amendments do not automatically disqualify a petitioning creditor if only a part of its claim is in dispute. *See* 2 Collier on Bankruptcy P. 303.11. The reasoning in *DemirCo Holdings* is compelling on this point, where the court noted:

> With the dearth of committee comments and legislative history available to interpret BAPCPA, this Court cannot presume that Congress added the phrase "as to liability or amount" with the intent that the claims of involuntary petitioners must now be fully liquidated either by agreement or judgment so that no dispute exists as to any portion of such claims. Without clear legislative intent, this Court cannot presume such a change in the law and declines to do so.

*DemirCo Holdings*, 2006 Bankr. LEXIS 1131, at *9; *accord In re Project Restore, LLC*, 2022 Bankr. LEXIS 2868 at *6 (Bankr. M.D. Tenn. 2022); *In re Seven Three Distilling Co., LLC*, 2021 Bankr. LEXIS 1790, at *24 (Bankr. E.D. La. July 6, 2021); *In re Williams*, 616 B.R. 690, 694

(Bankr. N.D. Tex. 2020); *In re* 3 *Man Corp.*, 2014 Bankr. LEXIS 3675, at *12 (Bankr. M.D. Pa. Aug. 29, 2014).  Indeed, as the court in *3 Man* noted, "[t]aken to an extreme, if $99,900 of a $100,000 debt was undisputed but $100 was disputed, an alleged debtor could seek to disqualify the petitioning creditor."  *3 Man Corp.*, 2014 Bankr. LEXIS 3675, at *12.  As aptly reasoned by the *3 Man* court, that result is "absurd." *Id.*

This Court should adopt the reasoning in *DemirCo Holdings* and *3 Man* and reject Whairhouse's absurd argument that a conveniently and newly manufactured dispute as to a portion of the Petitioners' claims automatically renders them disqualified.  As discussed in *DemirCo Holdings*, there is simply no basis to conclude that the BAPCPA amendments were designed to disqualify a petitioning creditor where the undisputed portion of its claim exceeds the statutory thresholds set forth in section 303 of the Bankruptcy Code.  Additionally, as *3 Man* indicates, Whairhouse's interpretation of section 303(b) could lead to absurd results.  Whairhouse admits that "the [Petitioning Creditors] may be entitled, in the best case, to recover no more than the amount or value actually lent . . ." (D.I.#14.1, at 4) Given that the amount of capital invested by each of the Petitioners was no less than $100,000, far in excess of the statutory threshold for qualification to file an involuntary petition, this Court should deem the Petitioners qualified to file the involuntary petition.

*****

To the extent the Court disagrees and believes that a dispute as to any amount of the Petitioners' claim must disqualify them, this Court should allow Petitioners the opportunity to amend their petition to simply assert the amount of capital actually invested – or more efficiently, simply deem the petition so amended because there is no bona fide dispute that Whairhouse owes

the Petitioners at least the amount they each invested.  To do otherwise would simply elevate form over substance and waste this Court's and the parties' time and resources because the Petitioners and the supporting additional victims could simply refile a new involuntary petition asserting claims for only the amount they actually invested, which is undisputed.

To that end, on January 12, 2024, three new petitioning creditors filed an amended petition, adding their claims only as to the actual principal amount they invested and have not been repaid after the properties they invested in were sold. (D.I.#50) Therefore, there can be no dispute as to the amount they are owed.

It is indisputable that Whairhouse is not paying its debts when they come due and there are more than three unsecured creditors who are indisputably owed more than $18,600 in the aggregate who seek to put Whairhouse into an involuntary proceeding.  Therefore, an order for relief should be entered.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should enter an order for relief against Whairhouse.

Dated: January 12, 2024                    **PASHMAN STEIN WALDER HAYDEN, P.C.**

*/s/ Sean Mack*
_____
Sean Mack
Darcy Baboulis-Gyscek
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201)488-8200
smack@pashmanstein.com
dbaboulis-gyscek@pashmanstein.com

*Attorneys for Petitioning Creditors*